UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>-v-<br><br>ROBERTO PALACIO,<br><br>Defendant. | 25-CR-661 (VSB)<br><br>**OPINION & ORDER** |

VERNON S. BRODERICK, United States District Judge:

On September 20, 2024, Defendant Roberto Palacio ("Defendant" or "Palacio") was charged with destruction of government property, in violation of 18 U.S.C. § 1361. (Doc. 1 ("Compl." or "Complaint").) On December 3, 2025, a grand jury returned an indictment charging Palacio with the same offense. (Doc. 32 ("Indictment").) Before me is Defendant's motion to dismiss the Indictment. (Docs. 47, 48 ("Mem.").) Palacio argues that the indictment must be dismissed because: (1) the conduct alleged does not constitute an "injury" or "depredation" under 18 U.S.C. § 1361; (2) the prosecution of his conduct is a violation of his First Amendment rights; and (3) the prosecution of his conduct violates the Religious Freedom Restoration Act ("RFRA"). For the reasons articulated below, Defendant's motion to dismiss the indictment is DENIED.

## I. Factual Background

### A. *The Burial Ground*

The African Burial Ground National Monument (the "Monument") sits on a portion of what was the nation's earliest and largest African American cemetery, which was established in or around 1673. (Compl. ¶ 3(a)–(b).) Because African Americans were prohibited from being

buried in churchyards within New York City at the time, the cemetery was located outside of the then-boundaries of the city. (*Id.* ¶ 3(b).) Approximately 15,000 to 20,000 men, women, and children were buried in the cemetery. (*Id.*) In 1795, the cemetery was sold for development and largely forgotten about for approximately two centuries. (*Id.*) In the early 1990s, during the excavation of what would become the Ted Weiss Federal Building, 419 human remains were uncovered at the location of a portion of the cemetery. (*Id.* ¶ 3(c).) In or around 2003, these remains were reinterred on the preserved portion of the cemetery on Duane Street near Foley Square. (*Id.*)

The cemetery, now known as the African Burial Ground National Monument, was declared a national monument in or around 2006, and is owned by the United States government. (*Id.*) The Monument features a granite prism that is surrounded by a circle of the diaspora, which contains 22 Adinkra symbols, each representing different African peoples and cultures. (*Id.* ¶ 3(d).) Next to these symbols, there are seven burial mounds, which contain the 419 bodies previously discovered at the cemetery. (*Id.*)

**B. *Vandalism***

On or about August 13, 2024, at approximately 4:30 a.m., Palacio entered the Monument, which was closed at the time, and graffitied it with brightly colored paint. (*Id.* ¶ 4(a).) Defendant, who is 38 years-old, has been an artist for most of his adult life and is inspired by artists like Jean-Michel Basquiat. (Mem. 5–6.) The graffiti included words, phrases, and symbols such as "Palacio," "REINCARNATION," Olympic rings, and "The Second Art Showing: Coming TIFF TIFF," which indicated how the audience could further engage with his art show. (*Id.* ¶ 4(c).) Moreover, it also included a large crown painted in the center of the circle of the diaspora and pink paint on the Adinkra symbols. (*Id.*) Later that same day, Palacio made

a public Instagram post (the "Post") that showed the digital rendering of a pink light beam emanating from the Monument. (*Id.* ¶ 6(b)–(c).) The Post announced the opening of an "art show" running from August 12 "until they take it down" and urged people to "go check it out." (*Id.* ¶ 6(c).) The Post also described details of graffiti, including the large blue crown and the pink paint on the Adinkra symbols. (*Id.*) Palacio added: "This was done, illegally. I Will be turning myself in, shortly." (*Id.*)

On or about September 5, 2024, members of law enforcement visited Palacio's residence in Brooklyn, and he voluntarily spoke with them. (*Id.* ¶ 7(a).) During this interview, Palacio admitted that on August 13, 2024, he committed an "expression of art" by vandalizing the Monument. (*Id.* ¶ 7(b).) Additionally, Palacio admitted that while he had originally planned to turn himself in soon after he committed the vandalism, he later decided to wait until September 10, 2024, because there were several art exhibits happening on that day. (*Id.* ¶ 7(c).) The cost to restore the Monument totaled "thousands of dollars." (*Id.* ¶ 5.)

## II. <u>Procedural History</u>

On September 20, 2024, Palacio was charged through the Complaint with destruction of government property, in violation of 18 U.S.C. § 1361. (Doc. 1.) On December 3, 2025, a grand jury returned the Indictment charging Palacio with the same offense. (Doc. 32.) Both the Complaint and the Indictment allege that the damage to the Monument exceeded $1,000, qualifying the charge against Palacio as a felony.

On June 2, 2026, Defendant filed his motion to dismiss the indictment, (Doc. 47), along with an accompanying memorandum of law, (Mem.). On June 29, 2026, the Government filed its opposition, (Doc. 49 (Opp'n)), and on July 13, 2026, Defendant filed his reply, (Doc. 50 ("Reply")).

## III. <u>Legal Standard</u>

A defendant may move to dismiss an indictment for failure to state an offense. *See* Fed. R. Crim. P. 12(b)(3)(B)(v). Rule 7 of the Federal Rules of Criminal Procedure requires that an indictment be "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c); *see United States v. Pirro*, 212 F.3d 86, 91 (2d Cir. 2000) ("A criminal defendant is entitled to an indictment that states the essential elements of the charge against him."). This is not a high bar, as "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (quoting *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998)).

"The dismissal of an indictment is an 'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights." *United States v. Avenatti*, 432 F. Supp. 3d 354, 360 (S.D.N.Y. 2020) (quoting *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001)). However, "[s]ince federal crimes are 'solely creatures of statute,' a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012) (quoting *Dowling v. United States*, 473 U.S. 207, 213 (1985)).

"[T]he sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." *Alfonso*, 143 F.3d at 777. Thus, "[i]n reviewing a motion to dismiss an indictment, the Court must take the allegations of the indictment as true." *Avenatti*, 432 F. Supp 3d at 360–61 (first citing *Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952); and then citing *New York v. Tanella*, 374 F.3d 141, 148 (2d Cir. 2004)).

## IV. Discussion

### A. *Violation of 8 U.S.C. § 1361*

Defendant first argues that his conduct does not constitute an "injury" or "depredation" within the meaning of 18 U.S.C. § 1361, because applying removable paint that is later "washed away without damaging the underlying surface" does not constitute "actual injury to the property." (Mem. 9–11.) Under 18 U.S.C. § 1361, it is unlawful to "willfully injure[] or commit[] any depredation against any property of the United States, or of any department or agency thereof." Indeed, according to Leonard B. Sand's *Modern Federal Jury Instructions (Criminal)*, Section 1361 has four elements: (1) the defendant "damaged (or destroyed)" (2) government property, (3) willfully, (4) causing damage greater than $1,000. 2 Leonard B. Sand, et al., *Modern Federal Jury Instructions (Criminal)* ch. 44A-2 (2021); *see also id.* ch. 44A-4 (explaining in the commentary that "courts routinely refer" to Section 1361 "as involving 'damage' to government property," without reference to "depredation," which "is unlikely to be in the vocabulary of the average juror"). "A violation of this statute can result in a fine and/or not more than ten years imprisonment where the property damaged exceeds the sum of $1,000." *United States v. Krause*, 914 F.3d 1122, 1127 (8th Cir. 2019).

"The statute does not define 'depredation' [or 'injury'] so one must find the dictionary or common meaning of the word." *United States v. Jenkins*, 554 F.2d 783, 786 (6th Cir. 1977). "In ascertaining the plain meaning of a statute, we presume that a legislature says in a statute what it means and means in a statute what it says." *Stanley v. Cottrell, Inc.*, 784 F.3d 454, 465 (8th Cir. 2015) (internal quotation marks omitted). "Depredation" has been characterized as the act of plundering, robbing, pillaging or laying waste. *See Jenkins*, 554 F.2d at 786 (discussing the definition of depredation under § 1361). Moreover, the ordinary meaning of injure is to "hurt,"

"harm," or to "inflict damage." *Injure*, Oxford English Dictionary, http://oed.com/dictionary/injure_v?tab=meaning_and_use#472270 (last visited Sept. 21, 2026). "Damage" means "injury or harm that reduces value or usefulness." *United States v. Strong*, No. 2:11-PO-2-JRM, 2011 WL 4072856, at *2 n.1 (D. Me. Sept. 12, 2011), *aff'd*, 724 F.3d 51 (1st Cir. 2013).

"[D]iminishing the economic value of government property, along with physically damaging the property, is an injury under § 1361." *United States v. Blount*, 35 F.3d 572, at *2 (9th Cir. 1994) (citation omitted). Indeed, "injure," "[a]s applied to a building," means "to materially impair." *United States v. Ortega-Hernandez*, No. 24-3023, 2026 WL 2577157, at *5 (D.C. Cir. Sept. 1, 2026) (quoting *Injure*, Black's Law Dictionary (3d ed. 1933), and *Injure*, Black's Law Dictionary (4th ed. 1951)). "The modern understanding is to the same effect"—"[i]njury . . . or impairment to the use of property." *Id.* (quoting *Criminal Damage to Property*, Black's Law Dictionary (12th ed. 2024)).

The Indictment clearly meets the Rule 7 requirement, which simply requires that the indictment does "little more than to track the language of the statute charged." *Yannotti*, 541 F.3d at 127 (internal quotation marks omitted). Here, the Indictment, following the language in the statute, states:

> the defendant, willfully injured and committed a depredation against property of the United States, and of any department or agency thereof, and of property which has been or is being manufactured and constructed for the United States, and any department or agency thereof, and attempted to commit the foregoing offenses, and the damage or attempted damage to such property exceeded the sum of $1,000, to wit, PALACIO graffitied the African Burial Ground National Monument in New York, New York, causing more than $1,000 in damage.

(Indictment ¶ 1.) At this stage, no more is required, and the factual question of whether Palacio's conduct actually constitutes an injury or depredation is best left to a jury. Indeed, Defendant cites

no cases where an indictment was dismissed because the injury alleged—spray-painting graffiti on government property—was removed "without damage to the [property] itself," (Reply 3), nor have I found any.

Additionally, I find that at this stage, the Government pleads enough facts to show that Palacio's graffiti on the Monument constitutes "injury" to the Monument. His graffiti caused the Monument to temporarily close to visitors and required over $1,000 to clean up, "reduc[ing] [its] value or usefulness," *Strong*, 2011 WL 4072856, at *2 n.1, and "impair[ing] [] the use of property," *Ortega-Hernandez*, 2026 WL 2577157, at *5. The sole case Palacio cites where a court found that there was no "physical damage" or "injury" under § 1361 concerned only trespass of federal property, with no damage or alteration of the property at all. *Jenkins*, 554 F.2d at 785–86. The facts in *Jenkins* are materially different than the facts here. Therefore, Plaintiff's reliance on *Jenkins* is misplaced, since there is no dispute that Palacio physically altered the Monument by spray-painting it with graffiti, even if the paint was later removed from the Monument. Indeed, the cost to repair the Monument, which totaled thousands of dollars, (Compl. ¶ 5), could serve as evidence of damage, or injury, to the property itself.

Moreover, although the cases convicting defendants under § 1361 do not explicitly define what constitutes "injury" or "depredation" under the statute, as Palacio argues, (*see* Reply 3–4), multiple cases in other districts and circuits nonetheless document that criminal defendants have been convicted for similar behavior, including the use of spray paint and graffiti on government property, under § 1361. *See, e.g.*, *United States v. Grady*, 18 F.4th 1275, 1281–83 (11th Cir. 2021) (affirming conviction under Section 1361 for peaceful protest that involved spray painting naval facilities, pouring blood on the door of a building, removing signage, and placing crime scene tape on property); *Cobble v. United States*, No. 09-379C, 2009 WL 2610532, at *1 (Fed.

Cl. Aug. 24, 2009) (noting prosecution and conviction under § 1361 "for pouring tar on the steps of the Federal Courthouse in Louisville, Kentucky"); *United States v. Vazquez*, No. 15-CR-156, 2020 WL 4745197, at *1 (W.D.N.Y. Aug. 17, 2020) (noting charge and conviction under § 1361 for "damaging government property," after defendant carved "Fuck You" into counsel's table during prior trial); *United States v. Cassidy*, 616 F.2d 101, 101 (4th Cir. 1979) (affirming conviction on other grounds where "[d]efendants were convicted of depredation of government property in violation of 18 U.S.C. § 1361 when they threw or poured blood and ashes on the walls and ceiling of the Pentagon in the course of a demonstration against the design and possession of nuclear weapons"); *United States v. Carlson*, No. 10-CR-00298, 2011 WL 13141452, at *1 (D. Idaho Sept. 15, 2011) (noting in motion in limine ruling before trial that defendants were indicted pursuant to § 1361 for "spray paint[ing] the rock face at the Red Elk Rock Shelter located on land belonging to the United States"); *United States v. Dorrell*, 758 F.2d 427, 429, 433–34 (9th Cir. 1985) (affirming conviction under § 1361 on other grounds, where defendant spray-painted political slogans on government property).

In sum, the Government has sufficiently alleged in the Indictment that Palacio's conduct caused "injury" or "depredation" to government property within the meaning of 18 U.S.C. § 1361. Defendant's motion to dismiss the Indictment on the theory that his conduct alleged does not constitute an "injury" or "depredation" under 18 U.S.C. § 1361 is therefore DENIED.

### B. *Violation of First Amendment*

Next, Defendant argues that "applying Section 1361 to criminalize the expressive conduct at issue here would violate [his] First Amendment rights." (Mem. 12.) Palacio argues that his conduct "was an act of artistic and spiritual expression intended to honor the African Burial Ground" and "[w]here expressive conduct leaves government property unharmed, the

connection between the prosecution and the asserted governmental interest is far too attenuated." (*Id.* at 12–14.)

The First Amendment "affords protection to symbolic or expressive conduct." *Virginia v. Black*, 538 U.S. 343, 358 (2003). The parties presumably agree that Palacio's conduct, which includes artistic expression, falls within the ambit of the First Amendment, (*see* Opp'n 10). *See also Mahoney v. Doe*, 642 F.3d 1112, 1116 (D.C. Cir. 2011) (noting that "the creation of words or images through chalk is an expressive act," so the government's actions "can be analyzed within the usual First Amendment framework").

However, "when speech and nonspeech elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States v. O'Brien*, 391 U.S. 367, 376 (1968) (internal quotation marks omitted). "The level of scrutiny applied to a restriction on speech depends upon the nature of the forum in which the speech occurs." *R.O. ex rel. Ochshorn v. Ithaca City Sch. Dist.*, 645 F.3d 533, 539 (2d Cir. 2011). "Fora for expression are classified into four categories, which fall along a spectrum extending from those deserving the greatest constitutional protection to those deserving the least constitutional protection: (1) the traditional public forum; (2) the designated public forum; (3) the limited public forum; and (4) the non-public forum." *Id.* (citing *Make the Rd. by Walking, Inc. v. Turner*, 378 F.3d 133, 142–43 (2d Cir. 2004)). "Traditional public fora are those places which by long tradition or by government fiat have been devoted to assembly and debate." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985) (internal quotation marks omitted). "Public streets and parks fall into this category." *Id.* A designated public forum consists of "public property which the state has opened for use by the public as a place for expressive activity." *Perry Educ.*

*Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45, (1983). "The Constitution forbids a state to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place." *Id.* (collecting cases, including ones showing that a university meeting facility, municipal theater, and school board meeting are designated public forums). Lastly, "a nonpublic forum is by contradistinction public property which is not by tradition or designation a forum for public communication." *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 514 (D.C. Cir. 2010) (internal quotation marks omitted).

Here, I need not decide what forum the Monument is, because even if it were a traditional public forum, where speech and expression deserve the highest level of constitutional protection, the Government's prosecution of Palacio's conduct still does not violate the First Amendment. The Government's "ability to restrict expressive conduct in a traditional public forum is limited to the enforcement of time, place, and manner regulations, provided the restrictions 'are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.'" *Mahoney*, 642 F.3d at 1117 (quoting *United States v. Grace*, 461 U.S. 171, 177 (1983)).

Here, § 1361 on its face and as applied to Palacio is indisputably content neutral. The statute simply prohibits willful injury or depredation against any property of the United States, 18 U.S.C. § 1361, "without reference to the message the speaker wishes to convey." *Id.* at 1118. Nor is there any evidence that the Government is specifically prosecuting Palacio because of the messages he graffitied on the property.

Second, the government has "a weighty, essentially esthetic interest in proscribing intrusive and unpleasant formats for expression." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 806 (1984); *see also Marcavage v. City of New*

*York*, 689 F.3d 98, 104 (2d Cir. 2012) (government has "a significant interest in keeping its public spaces safe"). "This interest is especially important here where the special nature of the forum, a national monument, serves to heighten esthetic concerns." *United States v. Nieves*, No. 18-CR-835, 2019 WL 1315940, at *4 (S.D.N.Y. Mar. 22, 2019) (internal quotation marks omitted) (rejecting defendant's first amendment challenge to criminal anti-vandalism regulation where defendant defaced a sign at the African Burial Ground National Monument); *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 650–51 (1981) ("Consideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved."). Even in a public forum, the First Amendment does not confer "an unlimited right of access to the property" or a right to install "an artwork . . . on a public sidewalk or park." *People for Ethical Treatment of Animals v. Giuliani*, 105 F. Supp. 2d 294, 317–18 (S.D.N.Y. 2000), *aff'd*, 18 F. App'x 35 (2d Cir. 2001). Nor does "the right to address an audience from the platform of a public monument . . . confer upon a speaker the freedom to paint a message on it, or to readorn with graffiti property owned by the government or by another person." *Id.*

The statute's prohibition against injury or depredation to the Monument is also "narrowly tailored to advance this interest, curtailing no more speech than is necessary to accomplish its purpose of protecting the property and advancing esthetic values." *Nieves*, 2019 WL 1315940, at *4. Indeed, "[n]o one has a First Amendment right to deface government property." *Mahoney*, 642 F.3d at 1122 (Kavanaugh, J., concurring) (upholding a criminal prohibition on defacing or chalking the street in front of the White House); *United States v. Murtari*, No. 07-CR-0428, 2008 WL 687434, at *4 (N.D.N.Y. Mar. 11, 2008) ("[T]he First Amendment simply does not protect

or afford a right of defacement of government property, including by the use of chalk."). This is true even here where Palacio's graffiti could be and was removed from the Monument. Even if "the defacement at issue is temporary and can be cured . . . [t]he government can proscribe even temporary blight." *Mahoney*, 642 F.3d at 1119. "It is the tangible medium—[marking]—that creates the very problem the [statute] seeks to remedy." *Id.* at 1118. Furthermore, alternative avenues of communication not involving the defacement of government property were available for Palacio's artistic expression.

Palacio does not have license to graffiti anywhere he wishes simply on the basis that he believes he is artistically expressing himself. Thus, I find that Defendant's First Amendment claim fails, and his motion to dismiss the Indictment on this basis is DENIED.

### C. *Violation of Religious Freedom Restoration Act*

Finally, Defendant argues that dismissal is warranted because the Government's application of § 1361 to Palacio violates the RFRA. (Mem. 14–17.) Defendant argues that dismissal is warranted under RFRA because his actions were "motivated by sincerely held spiritual beliefs concerning the process of self-coronation, which relies on ancestral connection uniquely found at the Monument." (*Id.* at 16.) Thus, Palacio argues that the Government's prosecution of this conduct substantially burdens his exercise of religion and "exerts extraordinary pressure on an individual to refrain from engaging in conduct he believes to be spiritually significant." (*Id.* at 16–17.)

RFRA provides that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the government "demonstrates that [the] application of the burden to the person" is "the least restrictive means of furthering" a "compelling governmental interest." 42 U.S.C. § 2000bb-1(a)–(b). "To establish a

*prima facie* RFRA violation, the plaintiffs must demonstrate that they sought to engage in the exercise of religion and that [the Government] substantially burdened that exercise." *Sabir v. Williams*, 52 F.4th 51, 59 (2d Cir. 2022). The "exercise of religion" is defined broadly as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A). In considering whether a plaintiff has engaged in the exercise of religion, I am "not permitted to ask whether a particular belief is appropriate or true—however unusual or unfamiliar the belief may be." *Jolly v. Coughlin*, 76 F.3d 468, 476 (2d Cir. 1996). Rather, my "scrutiny extends only to whether a claimant sincerely holds a particular belief and whether the belief is religious in nature." *Id.* "In sum, to show that an individual's beliefs are part of his exercise of religion, the individual need only demonstrate that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Tanvir v. Tanzin*, 120 F.4th 1049, 1059 (2d Cir. 2024) (internal quotation marks omitted). Next, once an individual establishes a *prima facie* case showing that the Government substantially burdened his or her exercise of religion, "[t]he government then faces an 'exceptionally demanding' burden to show 'that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties.'" *Sabir*, 52 F.4th at 59 (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014)).

I note that "RFRA may be raised as a defense to criminal prosecution." *Grady*, 18 F.4th at 1285); *see also United States v. Christie*, 825 F.3d 1048, 1055 (9th Cir. 2016) (explaining that RFRA may be invoked as a defense to a criminal prosecution); *United States v. Wilgus*, 638 F.3d 1274, 1279 (10th Cir. 2011) (same). Here, Palacio fails to establish a *prima facie* case under RFRA. Even assuming that his sincerely held religious beliefs require him to engage in the process of "self-coronation" at the Monument, (Mem. 16), he does not properly establish that the

Government's prosecution prohibiting him from graffitiing the monument "substantially burden[s]" that belief. 42 U.S.C. § 2000bb-1. RFRA's "substantial burden" test "requires an objective inquiry into the extent of the governmental pressure on the plaintiff's exercise of religion." *Kravitz v. Purcell*, 87 F.4th 111, 126 (2d Cir. 2023). "A substantial burden exists where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Newdow v. Peterson*, 753 F.3d 105, 109 (2d Cir. 2014) (internal quotation marks omitted and alterations adopted). In other words, "substantial burden on religious exercise exists when an individual is required to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion on the other hand." *Westchester Day Sch. v. Village of Mamaroneck*, 504 F.3d 338, 348 (2d Cir. 2007) (internal quotation marks omitted).

Palacio neither explains why "self-coronation" and this particular form of religious expression can only be accomplished through illegal defacement of property rather than through other forms of art and expression, nor does he contend that the Monument is the only site where he can practice these spiritual expressions. Indeed, Defendant simply makes the conclusory statement that a criminal prosecution is a "substantial burden on his exercise of religion" without anything more. (Mem. 17.) This mere parroting of the language of the statute does not warrant dismissal. Moreover, "[t]he availability of alternative means of fulfilling religious obligations . . . cautions against the finding of a substantial burden." *Ferguson v. Owen*, No. CV 21-02512, 2022 WL 2643539, at *7 (D.D.C. July 8, 2022), *aff'd*, No. 23-5102, 2024 WL 120099 (D.C. Cir. Jan. 11, 2024), *and aff'd*, No. 23-5102, 2024 WL 120099 (D.C. Cir. Jan. 11, 2024); *see also Henderson v. Kennedy*, 253 F.3d 12, 16–17 (D.C. Cir. 2001) (ban on T-shirt sales on the National Mall does not substantially burden religious groups who sought to sell religiously

themed T-shirts because they could sell T-shirts elsewhere). Although Palacio contends that self-coronation relies on an "ancestral connection uniquely found at the Monument," (Mem. 16), he also acknowledges that "self-coronation" can occur at places "where he [feels] a profound connection to his ancestors and their history." (Mem. 7.) This could presumably occur at many other locations other than the Monument. Palacio also provides no information concerning why the only way to express "self-coronation" was through graffiti, rather than a lawful method of expression, at the Monument. Thus, I find that Defendant's RFRA claim also fails, and Defendant's motion to dismiss for violation of RFRA is DENIED.

## V. Conclusion

For the reasons stated above, Defendant's motion to dismiss the indictment is DENIED.

SO ORDERED.

Dated: September 21, 2026
New York, New York

Vernon Broderick

Vernon S. Broderick
United States District Judge